# S. J. CLAYTON ET AL. *v.* J. B. McCAY ET AL.

APPEAL BY PLAINTIFFS FROM THE COURT OF COMMON PLEAS OF DELAWARE COUNTY.

Argued February 11, 1891—Decided October 5, 1891.
[To be reported.]

1. Equity will compel one of several heirs who has had sole possession of the real estate owned by them in common, to account to his co-heirs for their proportions of the rental value of the land during the time of his occupancy thereof, whether his exclusive possession was with or without the consent of the other owners.
2. When heirs have agreed that one of them shall occupy the land until a specified event, paying rent at a certain rate, and his possession, taken under the agreement, is continued after the occurrence of such

event, the rent fixed by the agreement will be treated as the measure of liability during such continued occupancy, when there is no evidence of a change of value.

3. When one heir has obtained exclusive possession under such an agreement, he is bound to restore possession as fully as he received it. He cannot terminate his liability for rent, by an unaccepted offer to surrender his rights under the agreement, while leaving his sub-tenants in possession; their possession is his possession, and he will remain liable while it continues.

Before PAXSON, C. J., STERRETT, GREEN, CLARK and WILLIAMS, JJ.

No. 102 January Term 1891, Sup. Ct.; court below, No. 1 June Term 1887, C. P. in Equity.

On May 12, 1887, Sarah J. Clayton and Thomas J. Clayton, her husband, William McCay and George L. McCay filed a bill in equity against John B. McCay, Jr., and Emma McCay, for the partition of certain lands of the estate of John B. McCay, deceased, between the plaintiffs and the defendants. The case was so proceeded in that the lands in question were sold by a master under an order of the court, and on April 1, 1889, possession was delivered to the purchaser.

On April 5, 1889, the plaintiffs filed a supplemental bill against the defendants, praying that in the distribution of the proceeds of the sale made by the master the defendants be required to account for the rents of certain parts of the land which, as was averred, had been occupied by them respectively from the death of the decedent until the delivery of possession to the purchaser, and also for certain acts of waste charged to have been committed by them respectively. The supplemental bill having been answered by the defendants, and issue joined, the proceeding was referred to the master, *Mr. John T. Reynolds*, who afterwards reported finding in substance the following facts:

John B. McCay died on February 23, 1885, testate, leaving five children, to wit: Sarah J. Clayton and William, George, John and Emma McCay. By his will, he devised farms to William, George L., John B. and Emma, respectively, the devises being for life with remainders to the children of the several devisees. Caveats having been filed against the probate

of the will, the following agreement dated April 1, 1885, was entered into by all the children of the testator:

"Whereas, caveats have been filed in the office of the register of wills, in and for the county of Delaware and state of Pennsylvania, against the admission of the alleged last will and testament of John B. McCay, late of the township of Upper Chichester in said county, deceased, dated the seventh day of February, A. D. 1885, by reason of which the probate of said alleged will is still pending before the said register.

"And whereas, on account of the personal estate of which the said decedent died possessed having been divided by the terms of said alleged will in certain proportions in kind among his children, and on account of the real estate of said decedent by said alleged will being divided among certain of his children, and for other reasons, it is important, in order to subserve the best interests of the heirs, that some agreement should be entered into with reference to the disposition of said personal estate and the occupancy of said real estate pending the controversy over said alleged will.

"Now this agreement, among the undersigned, being all the heirs of said decedent, witnesseth:

\*      \*      \*      \*      \*      \*      \*      \*      \*

"4. The several devisees under the said alleged will, who would be entitled to the control and possession of the real estate devised thereby, if the said will had been admitted to probate, shall enter into possession of their respective parts, except William, being now in possession of the land devised to John and about eight acres of that devised to himself, shall remain in possession thereof, pending litigation upon said alleged will, and John shall have the right to the possession of the remainder of the part devised to William during the same period; each accounting to the other in case the will is sustained for the rent of the respective parts according to the annexed schedule of rents, so as to give each the proper rental value of the land devised to him; the rent due by John to William being set off against that much of the rent due by William to John; and, in case the will is not sustained, then each shall account to the parties legally entitled to the rent at the same rate; provided, that William shall have the privilege of manuring the eight acres with manure from the lands de-

vised to John, and John shall have the privilege of removing from the premises of William occupied by John any hay or grass he may cut on the land devised to William, to compensate him for the manure so taken by William.

"5. In case the alleged will shall not be proved and sustained as the last will and testament of the said decedent, and said real estate shall become distributable under the intestate laws, or under the provisions of any other paper which may be established as a will of said decedent, whereby a different scheme of distribution may become necessary, then, in either of such cases, the several children who are to have the possession of the lands under this agreement shall account for, and pay over or be charged with rents for their respective portions as follows : "

\* \* \* \* \* \* \* \* \*

The register having admitted the will to probate, an appeal from his decision was taken to the Orphans' Court, resulting in a verdict, rendered April 20, 1887, in an issue devisavit vel non, against the will, and on June 7, 1887, the court made a formal decree reversing the register's decision.

On May 11, 1887, the present plaintiffs brought ejectment against the defendants herein for the recovery of undivided interests in the farms occupied by the latter under the agreement of April 1, 1885. A verdict for the plaintiffs was rendered in the ejectment suit on June 23, 1887, and judgment was entered thereon on October 3, 1887. The record being removed to the Supreme Court by writ of error, that judgment was affirmed, and the record remitted March 6, 1888: McCay v. Clayton, 119 Pa. 133.

On December 24, 1887, John B. McCay, Jr., and Emma McCay, the defendants herein, gave notice to the plaintiffs that they were not satisfied to continue on the farms occupied by them for another year, under existing "terms as to rent, " and unless a satisfactory arrangement could be made they would vacate the property at the first of April following, which they designate in said notice as "the end of our present terms." Pursuant to said notice the defendants moved away on the first of April, 1888, or on the day preceding, leaving in the door the key to the mansion house in which they had lived, with directions from the said John B. McCay, Jr., to a man

who was then working for him to take the key and give it to one of the tenants of the defendants who occupied the spring-house on the premises. This was done as directed, and a notice put on the door by the said John B. McCay, Jr., that the said key was at the spring-house. Because of the vacation of the premises, as stated, a large quantity of grass thereon was wasted, there being no practical effort made by any of the parties to harvest the crop of 1888. The defendants, it appeared, assuming that they were no longer tenants, disclaimed all sole responsibility in the matter ; while the plaintiffs, holding that the defendants were still in possession, refrained from doing anything, for fear that any action by them might be considered as an acceptance of the property, and thereby relieve the defendants from the payment of rent under the agreement of April 1, 1885.

Prior to leaving the premises, the said John B. McCay, Jr., sold therefrom, against the protest of the plaintiffs, a quantity of the manure on the premises, worth, as appeared by the testimony, about thirty dollars. It also appeared that each of the defendants made a lease to tenants of the premises for the year ending March 25, 1889, but for the said term collected no rent.

With reference to the manure, the defendants admitted that they had no legal right to sell any portion of it off the lands where it had been made, but claimed that they were equitably entitled to do so by reason of the fact that at a sale of the personal property of the decedent not specifically bequeathed, made by Thomas J. Clayton, Esq., one of the said plaintiffs and the administrator of the estate of the decedent, they had under protest bought the manure then in the yard on the premises afterwards occupied by them, in order to prevent it being sold off the said premises, and paid for the same $120, its appraised value. Claiming that the administrator had no right to sell the manure as stated, nor the heirs, the plaintiffs, to receive their proportion of the value thereof, they invoked the rule that " he who asks equity must first do equity," and urged that they be not surcharged with the value of the manure sold by them, the said sale being made, as they alleged, to reimburse themselves partially for the loss of $120 paid by them for manure sold by the administrator as aforesaid, without, as they contended, any authority or right.

### Statement of Facts.

The master reported further, in substance, that by its own terms the agreement of April 1, 1885, came to an end when the controversy over the will was ended, viz., with the verdict of April 20, 1887; that, by remaining in possession after that date, the defendants impliedly entered into a new agreement, indefinite as to time, but in terms and conditions the same as the original compact, and conferring and imposing on the parties, respectively, the same rights and obligations; that this implied agreement, like the original one, could be ended only by the mutual consent of all the parties, or by a proceeding in partition, and therefore the question raised by the claim of the defendants that they surrendered their holdings on April 1, 1888, was unimportant, as it was not shown that the plaintiffs accepted the property and any surrender without such acceptance would, in the circumstances, avail nothing; that, in the master's opinion, the defendants continued liable for the rents specified in the agreement of April 1, 1885, down until April 1, 1889; that the defendants claimed to be relieved from liability for rent for the year ending on the date last named, by the recovery against them in ejectment, but from all the testimony in the case the master was satisfied that the ejectment suit was an amicable action to settle the title, and not an adverse proceeding to obtain actual possession; that, as to the sale of manure by the defendants there was no evidence that the plaintiffs were injured thereby, and therefore their claim for the value thereof should not be allowed; and that it was not incumbent on the master to pass upon the right of the administrator to make sale of the manure sold by him.   In accordance with the conclusions so reported, the master stated an account charging the defendants and William and George L. McCay, respectively, with rents down to April 1, 1889, at the respective rates specified in the agreement of April 1, 1885, and deducting said rents from their respective shares of the purchase money of the land.

The report having been referred back to the master, to take further testimony, he filed a supplemental report on May 26, 1890, finding the following additional facts:

1. That John B. McCay, Jr., one of the defendants, by an agreement dated January 2, 1888, re-leased a portion of the premises occupied by him to John H. Worrilow for one year

from March 25, 1888, and that the said John H. Worrilow
remained in possession, under the said agreement and original
lease, during the said period.   Also, that the said John B. Mc-
Cay, Jr., by an agreement dated December 31, 1887, re-leased
another portion of said premises to James H. Pierce for the
year 1888, and that the said James H. Pierce remained in pos-
session under the said agreement until March 26, or 27, 1889.

2. That Emma McCay, one of the defendants, leased to
Edwin Beeson a portion of the premises occupied by her for
one year from March 25, 1887 ; that, so far as the master was
informed, no notice to quit was given to the said Edwin Bee-
son by the said Emma McCay; and that the said Edwin Bee-
son remained in possession under the terms of said lease, until
March 25, 1889.

3. That neither the said John B. McCay, Jr., nor the said
Emma McCay, assigned, or offered to assign, to the other heirs
the said leases, or any interest therein.

4. That the plaintiffs did not accept from the said defend-
ants the premises aforesaid, or any part thereof.

Exceptions to the master's report having been argued, the
court WADDELL, P. J. 15th district, specially presiding, filed
the following opinion :

The exceptions filed to the master's report and pressed upon
the argument, relate solely to the liability of the defendants,
for the rent of their respective properties, from April 1, 1888,
to April 1, 1889.

This liability depends, as the master properly says, upon the
construction of a certain agreement, entered into by both plaint-
iffs and defendants on the first day of April, 1885.   He holds
that it was a leasing of the premises by the plaintiffs to the de-
fendants, and by reason of the terms of this lease, and the law
applicable thereto, they are liable for the rent in question.
[We doubt, however, whether the position of landlord and ten-
ant existed, and therefore, whether the rules applicable to
such a relationship apply.] [3]

The defendants were either the devisees of John B. McCay,
or his heirs at law, and in either event they owned and were
entitled to the possession of the land referred to in the agree-
ment.   They agreed among themselves to pay for its occu-

pancy, "pending the controversy over his alleged will;" not as tenants, but "in order to subserve the best interest of the heirs." [When this controversy ended, they were no longer liable to pay the rent. They made no agreement to pay after that event happened.] [4] When did it happen? The master says the controversy ended with the verdict on the issue, to wit, April 20, 1887. This may admit of some question, but whether it ended on that day or on the sixth day of March, 1888, when the remittitur from the Supreme Court was filed, is immaterial in this view of the case, since the defendants admit their liability up to March 31, 1888; and such a liability may be properly inferred from the terms of their agreement.

[It is an agreement to pay a stipulated annual rent, and the year is to be computed from the first day of April, 1885. Hence we infer, if the controversy over the will should end at any time between April and April, the occupier would be liable to pay the rent for the current year, up to the following first day of April. When the controversy terminated, and the first day of April after such termination arrived, his agreement to pay rent ended. If, therefore, the controversy over the will ceased upon either of the days heretofore named, the agreement to pay rent would only be binding up to the following first day of April. That would be April 1, 1888.] [5]

[Was there any agreement on the part of these defendants by implication or otherwise, to continue their liability beyond that date? We do not find it in the evidence. They may have prevented their co-tenants from obtaining entire possession of certain portions of the property, by having rented them, but this renting only affected their own interests. In our opinion, such an act did not amount to an extension or renewal of their agreement to pay rent for a longer period of time than the April following the end of the controversy over the will.] [6] If we are to be bound by this view of the agreement, their liability for rent would end with April 1, 1888.

But if the parties are to be considered as standing in the relation of landlord and tenant to each other, then what is the liability of these defendants? They are to pay an annual rent, and it was to be computed from a fixed period, but the duration of their tenancy was for an indefinite period of time. It depended upon a contingency. Such a lease is regarded as

a lease from year to year: Lesley v. Randolph, 4 R. 123; Thomas v. Wright, 9 S. & R. 87; Jones v. Kroll, 116 Pa. 85. If their tenancy ran from April to April, then the termination of the controversy over the will merely indicated the year within which this tenancy would cease. If this is so, the current year for which rent was payable always terminated on the thirty-first day of March of each year, whether the contingency happened or not. The tenant might quit, however, at the end of any current year, provided the contingency upon which his tenancy depended, happened during that year. He was not required to give notice of his intention to quit: Cook v. Neilson, 10 Pa. 41; Brown v. Brightly, 14 W. N. 497. Here the tenancy depended upon the conclusion of the controversy over the will. The master finds that this terminated on the twentieth day of April, 1887. If he is in error as to this date, it certainly ended some time before April 1, 1888. The contingency upon which the tenancy depended had therefore happened between April 1, 1887, and April 1, 1888, and if we are right, the tenant was entitled to terminate the tenancy at the end of that current year. This ended on the thirty-first day of March, 1888, and on that day the tenants left the premises. It was a surrender at the end of the term, and not a surrender during the term. If notice of their intention to leave was necessary, it was given on the twenty-fourth day of December, 1887. [If, as tenants of the plaintiffs, they had sub-let any portion of the premises, it was a letting in excess of their own estates, and was void as to those whose estates it infringed upon.] [7]

[The master holds, that the agreement between these parties ended, when the controversy over the will ended, to wit, on April 20, 1887; that their mutual rights and obligations then ceased, unless by common consent they chose to continue in possession of the lands for a further period; and if they did thus remain in possession, there would be raised by implication an agreement between them, indefinite as to time, but in terms and conditions the same as the original compact, and conferring and imposing upon the respective parties the same rights and obligations. We must differ with the learned master in this view of the case.] [8]

[If the agreement of April 1, 1885, is to be regarded simply as a contract, then, whenever their rights and obligations under

it ceased and were determined by its own terms and provisions, there can be no new contract raised by implication. The relative rights and obligations of the parties were at an end.] [9] If, however, it is to be regarded as a lease, and these defendants occupied the position of tenants, then their rights and obligations, as such tenants, must depend upon the character of their tenancy. If this was a tenancy for years, and they held over after its termination, they became either trespassers or tenants from year to year, as their landlords might elect, subject to all such covenants contained in the original lease as applied to their situation: Laguerenne v. Dougherty, 35 Pa. 45; Phillips v. Monges, 4 Wh. 226; Hemphill v. Flynn, 2 Pa. 144.

If the landlord saw fit to regard them as tenants, then they impliedly agreed to pay the same rent, and at the same point of time, as they agreed to pay for the first year. Their tenancy commenced with each year, as fixed by the original agreement: Diller v. Roberts, 13 S. & R. 63; Wood on L. and T., 62. If the lease created a tenancy for years, and fixed the limit of the year, then the same limit as to the year continued, if the tenants held over. The duration of the lease would be as definite as the amount of rent. If, then, the lease is to be regarded as a lease from year to year, and it required the year to be computed from April 1, 1885, it would end March 31st of the following year, and so on, from year to year, until it terminated, and the liability of the tenant for rent would cease at that point of time, in one of these years.

In whatever aspect we view the question, therefore, we are constrained to differ from the master in his conclusions. [We do not see how these defendants can be held liable beyond the first day of April, 1888. We understand the master has charged them each with the annual rent due from April 1, 1888, to April 1, 1889. In this particular we think he has erred, and we must remit his report for correction, and request him to make distribution in accordance with the views therein expressed.] [2]

And now September 18, 1890, the above matter referred back to said master, to make distribution in accordance with the foregoing opinion.

—In accordance with the foregoing order, the master re-

ported an amended account and schedule of distribution in which rents were charged against the respective parties until April 1, 1888, only; and on October 14, 1890, the court confirmed the amended report and ordered that distribution be made as therein set forth; whereupon the plaintiffs took this appeal, specifying that the court erred:

1. In not confirming the original report of the master.

2-9. In the rulings of the opinion embraced in [ ] 2 to 9

11. In not directing that the costs of the supplemental bill be paid by the defendants.

*Mr. V. Gilpin Robinson* and *Mr. Isaac Johnson*, for the appellants:

1. The proper construction of the paper of April 1, 1885, is that the agreement should end with the will contest, if the will should be sustained, but if the will should not be sustained, the agreement should continue until distribution under the intestate law. However, the parties being tenants in common by descent, or coparceners, the defendants are liable to account for rents during their exclusive possession, independently of the agreement. Bills for such accounts were entertained long before the statute of 4 Anne, Roberts' Dig., *48, which gave the right to an account as between tenants in common: 4 Kent Com., 365; Lorimer v. Lorimer, 1 Madd. Ch. Pr. 249; Jackson & G. on L. and T., 15; Paxson v. Gamewell, 82 Va. 706; Clements v. Cates, 49 Ark. 242.

2. The facts of the case bring it under even the statute of Anne. We have the exclusive possession obtained by the agreement; the making of leases by the defendants after the alleged ending of the agreement; the continued holding of exclusive possession; the waste and the failure to surrender to the other heirs the estates they had before the agreement was made: See Sailer v. Sailer (N. J.), 3 Cent. Rep. 687; Kitts v. Church, (Mass.) 3 N. E. Rep. 116. An agreement to pay rent may be implied between tenants in common: Almy v. Demels, 15 R. I. 318. On the question of waste, see, with respect to the right to sell manure, as between executor and heir: Wms. on Executors, 469; Yearmouth v. Price, Aleyn 32; s. c. 11 Vin. Ab. 175; Sty. 66; and as between co-heirs, or between heirs and agricultural tenants: Lewis v. Jones, 17

Pa. 262; Barrington v. Justice, 2 Clark 501; Waln v. O'Connor, 1 Phila. 353; s. c. 5 Clark 164; Jackson & G., L. and T., 83.

*Mr. J. M. Broomall* (with him *Mr. H. C. Howard*), for the appellees.

1. There can be no pretence for the contention that the term of the defendants, under the agreement of April 1, 1885, continued until April 1, 1889. The plaintiffs cannot deny that it had ended at least when they instituted their action of ejectment on May 11, 1887, nor when they commenced the proceedings in partition on the following day. It is not easy to see how such an agreement could be extended or renewed by implication. The occasion for such agreement had gone by, the controversy over the alleged will having ended. If so continued, however, it would then be subject to termination by either party at any time, as it was neither in form nor in substance a lease, and hence all the argument of the appellants about the defendants holding over as tenants goes for naught.

2. But, supposing that the relation of landlord and tenant did exist, the defendants would clearly have a right to quit on the first day of the April next after the termination of the contest over the will, as, if tenants at all, they were tenants from year to year, and the year ended on April 1st: Lesley v. Randolph, 4 R. 123; Thomas v. Wright, 9 S. & R. 87; Jackson & G., L. and T., § 357. There is no warrant for the conclusion that the litigation over the will ended on April 20, 1887. The will was the subject of controversy in the ejectment suit, which was not finally disposed of till March 6, 1888: McCay v. Clayton, 119 Pa. 133. Having taken the precaution to give the other heirs three months' previous notice of their intention to quit, there was then nothing to prevent the defendants from quitting on April 1, 1888. As they left on March 31, 1888, less than a month after the litigation over the will ended, they complied substantially with even the master's requirement that they must leave immediately at the end of the litigation.

3. By their written notice given in December, 1887, the defendants surrendered their rights under the agreement. Having done so, how could they retake those rights and lease the premises, or any part thereof, to third persons for another year, so

as to bind the other heirs? There can be but one answer. Anything that John might do after the surrender would not affect the rights and estates of his co-heirs, in the absence of other authority from them. As the court below says, the continuance of the sub-letting by John, who was the only heir that appears to have had anything to do with it, was simply void as to the estates of the heirs who did not agree to it. Nor could it affect Emma, who was no party to the holding over. Moreover, the sub-tenants occupied but a small portion of the farms, and hence any holding over could relate only to the parts so occupied.

OPINION, MR. JUSTICE STERRETT:

The main question presented for decision by this record is whether or not these appellees are liable to account for the rental value, during the year ending April 1, 1889, of the lands which had been assigned them under the agreement of April 1, 1885. They admit that they obtained possession of those lands, and so held them until April 1, 1888, by virtue of that agreement; and the finding of the master that their possession continued until April 1, 1889, must, in the absence of manifest error, be assumed to be the fact. The admission of appellees that their tenants continued in possession of part of the premises, in itself justifies the finding. The possession of these tenants was their possession; they could not subject the appellants to the risk, delay, and expense of litigation in turning the tenants out. In contemplation of the agreement, and in good faith, they were bound to restore possession as fully as they had received it by virtue of that agreement. Having obtained exclusive possession by virtue of the agreement, they must account for the whole period of that possession. Had they taken possession without the consent of the appellants, they must now have accounted. When the will was set aside, they became tenants in common, and liability to account for the use of their co-tenants' share of the land so used became an incident. It is therefore immaterial whether their exclusive possession was with or without the consent of the appellants: they were equally liable to account. The rental value of the premises having been ascertained by the agreement between the parties, and there being no evidence of change since, that

Syllabus.

may be justly assumed as the standard of value for the whole period of exclusive occupancy.

We are not convinced that there was any error in not directing that the costs of the supplemental bill should be paid by the defendants, John B. McCay, Jr., and Emma McCay.

> Decree reversed, and ordered that the costs of this appeal be paid by the appellees; and it is further adjudged and decreed that distribution be made in accordance with the schedule recommended by the master in his original report.